IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 18-cv-2973-WJM-KMT

KRISTIN WILCZYNSKI,

　　Plaintiff,

v.

LOYAL SOURCE GOVERNMENT SERVICES, LLC,

　　Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

　　Plaintiff Kristin Wilczynski ("Wilczynski") brings a wrongful discharge action under the Defense Contractor Whistleblower Protection Act ("Act"), 10 U.S.C. § 2409, against her former employer, Defendant Loyal Source Government Services, LLC ("Loyal Source"). Wilczynski—a civilian administrative nurse working at an Air Force base—contends that she was discharged at the Air Force's behest, in violation of the Act, for complaining about a change in how the Air Force handled primary care doctors' referrals to specialty practitioners.

　　Currently before the Court is Loyal Source's Motion for Summary Judgment. (ECF No. 40.) For the reasons explained below, the Court denies the motion.

### I. LEGAL STANDARD

　　Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

The following facts are undisputed for summary judgment purposes.

In 2011, a company named Clinical Coastal Management Services was awarded an Air Force contract "to provide clinical personnel to support U.S. Air Force Medical Treatment Facilities throughout the United States and Guam." (ECF No. 40 at 3, ¶ 2.)[1] Clinical Coastal Management hired Wilczynski to work as a contract employee at Peterson Air Force Base in Colorado Springs, and specifically to work as a "utilization manager." (*Id.* ¶ 3.) Wilczynski's "job duties included processing complex and ASAP medical referrals, by handling requests from primary medical providers to refer patients, military personnel, and their families to specialists within the military's medical system." (*Id.* at 4, ¶ 4.) Loyal Source eventually took over from Clinical Coastal Management

---

[1] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in exhibits.

and hired Wilczynski to continue performing her role at Peterson Air Force Base. (*Id.* ¶ 6.)

At least as early as May 2015, the Air Force informed Loyal Source that it had rated Wilczynski's job performance as "overall unsatisfactory." (*Id.* at 5, ¶ 18.) Loyal Source provides few details about this rating. Apparently there was either confusion or disagreement between Wilczynski and the Air Force about her daily job duties. (*Id.* at 6, ¶¶ 22–26.)

In November 2015, an Air Force supervisor sent Wilczynski an e-mail telling her that something Wilczynski had said or written "was completely inappropriate." (*Id.* at 7, ¶ 27.) Loyal Source does not explain what the Air Force supervisor found inappropriate, nor is it self-evident from the supervisor's e-mail to Wilczynski. (*See* ECF No. 40-10.)

From the beginning of her employment through approximately December 2015, Wilczynski had been handling "130 referrals per week, which amounted to approximately 100 patients per week because patients would occasionally have more than one referral." (ECF No. 47 at 5, ¶ 73.) "[A]fter December, 2015, these dwindled to just a few per week. In addition, she began receiving 15 or more phone calls per day from patients and from referring doctors that the referrals were not being processed." (*Id.*)

Curious, Wilczynski began investigating and discovered that her ASAP referrals were being routed to new queues in the relevant computer system, and "were being handled by untrained and unprepared administrators who did not know how to process them." (*Id.* ¶ 74.) These queues grew bigger by the day, with only a few referrals making it out of the queue. (*Id.*)

Wilczynski reported her findings both to her Air Force supervisors and to her Loyal Source supervisor, Jeff Henderson. (*Id.* ¶ 75.) Specifically as to Henderson, she told him "that approximately 100 patients per week were not being processed and that those patients were not receiving necessary medical care as requested by their family practitioners." (*Id.*) She also said that she had complained of the same problem to her Air Force supervisors. (*Id.* ¶¶ 77– 78.) This conversation happened no later than February 10, 2016. (*Id.* ¶ 77.) Wilczynski sent an e-mail to Henderson on February 9, 2016, saying that "by that time approximately 500 patients had not received necessary medical care." (*Id.* at 7, ¶ 81.) Another conversation with Henderson took place on February 16, 2016, in which Wilczynski repeated "that she was worried about patient referrals not being processed. She told him that family practice nurses had continued to call her requesting the status of their patients' referrals." (*Id.* at 6, ¶ 79.)

While this was happening, Wilczynski was also complaining to her Air Force supervisors. For example, on January 15, 2016, she told the base's chief nurse that "approximately 250 cumulative patients had not received necessary medical care because "the referrals were not being processed." (*Id.* at 5, ¶ 76.) On February 19, 2016, she wrote an e-mail to her direct supervisor, Capt. Jessica Roberts, stating that she (Wilczynski) "did not want to be responsible for the delays in treatment that had nothing to do with her and that she did not want to be reprimanded, or liable, for cleaning up this mess created by others." (*Id.* at 7, ¶ 82; *see also* ECF No. 40 at 5, ¶¶ 15, 17.)

While Wilczynski had been complaining to her supervisors and to Henderson, others had been complaining about Wilczynski to her Air Force supervisors.

4

Specifically, some complained that Wilczynski refused to follow standard procedures, used inappropriate language in records documenting the referral process, and had failed to process certain referrals that were still assigned to her.  (*Id.* at 8, ¶ 36.)

Wilczynski had a somewhat acrimonious meeting with Captain Roberts on February 15, 2016.  (*Id.* at 10, ¶¶ 40–50.)  Wilczynski "expressed her lack of trust for those who wear the uniform" and "voiced her plan to be vocal about her discontent with the Air Force and the Peterson facility once her contract was up."  (*Id.* ¶¶ 42, 44.)

Others continued to complain that Wilczynski was not a "team player."  (*Id.* at 11–13, ¶¶ 51–53, 58.)  Then, on February 22, 2016, an Air Force official instructed Loyal Source to remove Wilczynski from her post at Peterson.  (*Id.* at 13, ¶ 60.)  The Air Force told Loyal Source, among other things, that Wilczynski's "behavior has interfered with the organization's order and professionalism."  (*Id.* ¶ 59.)

On February 25, 2016, Henderson responded that Loyal Source would terminate Wilczynski's employment the following day.  (*Id.* at 14, ¶ 66.)  On February 26, 2016, Henderson telephoned Wilczynski and announced that she was terminated, effective immediately.  (*Id.* ¶ 67.)  A formal termination notice followed a few days later, which specified "involuntary termination due to 'CO [*i.e.*, contracting officer] requested removal.'"  (*Id.* ¶ 68.)

Wilczynski filed a grievance that was investigated by the Department of Defense Office of Inspector General.  (*See* ECF No. 40-1.)  The resulting report ("OIG Report") recites materially the same facts described above and then concludes that Wilczynski did not engage in protected whistleblower activity because her own testimony to the investigators allegedly established that the patients stuck in the referral queue faced no

5

danger.  (*Id.* at 9–14.)

Wilczynski filed this lawsuit on November 19, 2018.  (ECF No. 1.)

### III.  ANALYSIS

Wilczynski asserts a single claim for retaliatory discharge, in violation of the Act. (ECF No. 14 ¶¶ 28–34.)  The relevant portion of the Act reads as follows:

> An employee of a contractor [with the Department of Defense] . . . may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to [a Department of Defense employee responsible for contract oversight or management] information that the employee reasonably believes is evidence of * * * [a] substantial and specific danger to public health . . . .

10 U.S.C. § 2409(a)(1)(C).[2]  Except in certain circumstances that do not apply here, such "reprisal . . . is prohibited even if it is undertaken at the request of a [Department of Defense] official."  *Id.* § 2409(a)(3)(B).  In other words, the contractor usually cannot raise an "only following orders" defense.

The parties agree that *Cejka v. Vectrus Systems Corp.*, 292 F. Supp. 3d 1175 (D. Colo. 2018), properly states the elements of a claim under the Act.  (ECF No. 47 at 10; ECF No. 49 at 4.)  Those elements are:

1. the employee engaged in protected activity as described in the Act;
2. the contractor's decisionmaker knew the employee engaged in protected activity; and
3. the employee's protected activity was a contributing factor in the adverse

---

[2] This statute also applies if the contractor's employee reports "[g]ross mismanagement of a Department of Defense contract."  *Id.* § 2409(a)(1)(A).  In her Second Amended Complaint, Wilczynski pleaded that she complained both of gross mismanagement and a substantial and specific danger to public health.  (ECF No. 14 ¶¶ 28–29.)  In her summary judgment response brief, she argues only that she reported a substantial and specific danger to public health.  (*See* ECF No. 47 at 12–13.)  The Court thus focuses solely on the danger-to-public-health theory.

6

employment action taken against him or her.

*See Cejka*, 292 F. Supp. 3d at 1192.  If these elements are satisfied, the contractor can nonetheless escape liability if it shows by clear and convincing evidence that it would have taken the adverse employment action despite the employee's protected activity. *Id.*  The Court will discuss these elements in turn.

**A.     Protected Activity**

Loyal Source first argues that Wilczynski did not, as a matter of law, complain of a substantial and specific danger to public health or safety, or at least she could never convince a reasonable jury that made such a complaint.  (ECF No. 40 at 3, 16–17.)  Loyal Source's primary argument in this regard is that the OIG Report concludes that Wilczynski never made such a complaint.  (*Id.* at 16–17.)

Under the Act, "[a]n Inspector General determination . . . denying relief . . . shall be admissible in evidence in any de novo action at law or equity brought pursuant to this subsection."  10 U.S.C. § 2409(c)(3).[3]  Accordingly, it appears the Court must, at a minimum, consider the OIG Report for its evidentiary value—keeping in mind that this provision likewise establishes the *de novo* character of this lawsuit.  In other words, the OIG Report is deemed to be evidence, but it is not conclusive or entitled to deference.

The relevant portions from the OIG Report reads as follows:

> When asked what occurred in general if 28-day regular referrals or 24–72 hour urgent referrals were missed, [Wilczynski] testified to us that they "did not have those issues."

---

[3] This is a thinly interpreted section of the Act, and it is unclear whether it extends beyond Federal Rule of Evidence 803(8)(A)(iii), which is a hearsay exception for "factual findings from a legally authorized investigation."  *Cf. Busselman v. Battelle Mem'l Inst.*, 2018 WL 10374542, at *3–4 (E.D. Wash. Oct. 24, 2018).  The Court may presume that it does (*i.e.*, that it extends to legal conclusions as well) without affecting the outcome of this order.

7

* * *

> [Wilczynski's] allegation that the process change affected wait times for patients did not present a reasonable belief that any patients were in imminent danger as indicated in her testimony that they "did not have those issues." Thus her allegation about wait times did not present a reasonable belief of a substantial and specific danger to public health or safety.

(ECF No. 40-1 at 10, 13.) The Court finds that the quotation from Wilczynski's testimony—"that they 'did not have those issues'"—is far too vague to be of any meaningful evidentiary value on the current record.

Even if "did not have those issues" means that Wilczynski had yet to see anything bad happen to a patient on account of a delayed referral, the question would remain whether she nonetheless reasonably believed that the new referral process was placing patients in danger of adverse medical outcomes. In this regard, a helpful decision is *Chambers v. Department of Interior*, 602 F.3d 1370 (Fed. Cir. 2010). This decision interprets the Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8), which protects federal employees in a manner similar to the Act at issue in this case, including prohibiting retaliation for "any disclosure of information . . . which the employee . . . reasonably believes evidences * * * a substantial and specific danger to public health or safety," *id.* § 2302(b)(8)(A)(ii). According to *Chambers*,

> the outcomes of past cases addressing whether particular disclosures were protected as revealing a substantial and specific danger to public health and safety have depended upon whether a substantial, specific harm was identified, and whether the allegations or evidence supported a finding that the harm had already been realized or was likely to result in the reasonably foreseeable future. Cases in which the employee's burden was found to be satisfied have concerned specific allegations or evidence either of actual past harm or of detailed circumstances giving rise to a likelihood of impending harm.

8

602 F.3d at 1376.

No party has argued that this standard (or the protected activity element generally, regardless of interpretive glosses such as *Chambers*) must be decided as a matter of law, or in other words, that it is something a jury may *not* decide. Accordingly, the question is whether Wilczynski has evidence from which a reasonable jury could conclude that she identified a substantial and specific harm supported by actual past harm or detailed circumstances giving rise to a likelihood of impending harm. *See id.*

Here, Wilczynski asserts that she satisfies this standard as follows:

> She had been doing the referrals, at a rate of 130 per week, for almost four years. Those referrals almost ceased, which caused her to investigate how they were being handled. She discovered that instead of being handled, they were being dropped, which the calls from the patients and referring doctors confirmed.

(ECF No. 47 at 13.) Earlier in her brief, but addressing the same topic, she adds that "she handled both urgent and complex cases, [so] the referrals that she oversaw were more urgent than standard referrals." (*Id.* at 11.) The Court finds that these allegations, combined with a reasonable assumption that a near-breakdown in the referral system could create a substantial threat to public health, would be enough, if believed by the trier of fact, to support a reasonable finding in Wilczynski's favor on this element. Thus, summary judgment is not appropriate on this account.

**B.    Contractor's Knowledge of Protected Activity**

Loyal Source next argues that Wilczynski "cannot prove that she advised Loyal Source, or that [it] otherwise knew, that she had made a protected disclosure." (ECF No. 40 at 18.) However, as described above (Part II), Wilczynski reported her concerns to Henderson on at least three occasions, and also reported that she had expressed the

9

same concerns to her Air Force supervisors. Thus, Wilczynski's claim does not fail for lack of evidence supporting this element.

**C.     Contributing Factor**

A reasonable jury could also find in Wilczynski's favor on the contributing factor element. It is undisputed that Loyal Source terminated Wilczynski at the Air Force's behest for "behavior [that] has interfered with the organization's order and professionalism." (ECF No. 40 at 13, ¶ 59.) That alleged behavior included reporting about the breakdown of the referral process, which a jury could reasonably conclude to be protected activity. Thus, Wilczynski has enough evidence to satisfy her light burden on this element:

> A contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision. This element is broad and forgiving, and this test is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a significant, motivating, substantial, or predominant factor in a personnel action in order to overturn that action.

*Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) (internal quotation marks and citations omitted; alterations incorporated).

**D.     Whether the Contractor Would Have Taken the Same Action Regardless**

Loyal Source can attempt to convince a jury, by clear and convincing evidence, that it would have terminated Wilczynski regardless of the protected activity it allegedly knew about. *See Cejka*, 292 F. Supp. 3d at 1192. In its summary judgment motion, however, Loyal Source does not argue that, even if a jury finds for Wilczynski on all of the foregoing, clear and convincing evidence exists as a matter of law such that the jury could only find that Loyal Source would have terminated her despite her protected

10

activity. Accordingly, the Court need not address the issue at this phase.

## IV. CONCLUSION

For the reasons set forth above, Loyal Source's Motion for Summary Judgment (ECF No. 40) is DENIED. This matter REMAINS SET for a Final Trial Preparation Conference on March 10, 2020, at 2:00 PM, and a three-day jury trial beginning March 30, 2020, at 8:30 AM, both in Courtroom A801.

Dated this 6th day of March, 2020.

BY THE COURT:

William J. Martínez
United States District Judge